795 So.2d 1249 (2001)
Pamela C. POSEY, et vir, Plaintiffs-Appellants,
v.
Ben SINGLETARY, M.D., et al., Defendants-Appellees.
No. 34,913-CA.
Court of Appeal of Louisiana, Second Circuit.
September 28, 2001.
*1251 Nelson Cameron, Shreveport, Counsel for Appellants.
Pettiette, Armand, Dunkelman, by Lawrence W. Pettiette, Jr., Joseph S. Woodley, Shreveport, Counsel for Appellees Willis Knighton Medical Center, Louisiana Patients Compensation Fund, Ben Singletary.
Before BROWN, WILLIAMS and DREW, JJ.
DREW, Judge.
From a jury verdict in their favor and the denial of their post-judgment motions, Pamela C. Posey and her husband, Michael D. Posey, appeal in this medical malpractice action. Plaintiffs contend that the damages are inadequate, that the instructions to the jury were improper, and that the trial court erred in denying a mistrial, in refusing the introduction of certain evidence and in failing to grant their motions for new trial, additur and judgment notwithstanding the verdict. For the following reasons, the judgment is amended and, as amended, is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
Under La. R.S. 40:1299 et seq, the Poseys sought review of their claim from a medical review panel which was extended several times. In the Poseys' initial petition filed September 17, 1997, the plaintiffs named as defendants Dr. Ben B. Singletary and Dr. William L. Norwood. According to the plaintiffs, the medical review panel's opinion noted that the panel found neither doctor deviated from the applicable standard of care.[1]
*1252 The plaintiffs alleged that Dr. Singletary removed Mrs. Posey's ovaries and fallopian tubes on November 22, 1993, at Willis Knighton Medical Center (WK). During the surgery Dr. Singletary encountered pelvic adhesions, removed the ovaries and noted a 1 cm long tear in her bladder which he closed. According to the plaintiffs, Dr. Singletary did not evaluate her bladder or ureters for additional injury and did not obtain a urology consultation for her bladder. The basis of the plaintiffs' action is that Dr. Singletary cut, injured or otherwise obstructed Mrs. Posey's left ureter (tube connecting kidney to bladder) during the surgery. Mrs. Posey had to wear a catheter and experienced fever, nausea and abdominal swelling during her hospitalization and after her discharge on November 23.
The petition alleges she continued to have problems with swelling and fever which became so severe she was taken by ambulance to the hospital and diagnosed with an intestinal blockage. On November 30, Dr. Norwood performed surgery for lysis (separation) of adhesions in the proximal small bowel in the upper abdomen and drained 3,000 cc of fluid from her abdomen. The fluid was cultured, but there was no evaluation of the source of the fluid nor any evaluation of the ureters or bladder. During this second hospitalization Mrs. Posey continued to have abdominal swelling, pain, weakness and insomnia. While very ill, she was released from the hospital on December 6. During December she remained very ill and was seen by Dr. Norwood on several occasions.
According to the petition, on January 10, Dr. Norwood referred her to a urologist who on January 11 diagnosed her left kidney as hydronephrotic and recommended immediate surgery for repair of her kidney. Since the urologist was on the staff of Willis Knighton where Mrs. Posey did not wish to be hospitalized again, the urologist referred her to Dr. John Berry who admitted her to the Schumpert Medical Center on January 13, 1994.
Plaintiffs allege that three separate surgeries were performed to save her kidney, one of which was the insertion of a nephrostomy tube through her back directly into the kidney. Mrs. Posey had to wear the device for five weeks after her January 14 discharge from the hospital. On February 17, 1994, Dr. Berry performed corrective surgery to repair the ureter. On February 24, 1994, Dr. W. Reid Grimms, a proctologist, performed an incision of a hematoma abscess. The Poseys alleged her left kidney has been draining since December 1994, but she has been left with a permanent reflux.
In the plaintiffs' view, a 1996 surgery performed by Dr. Waterfallen to remove adhesions and repair a hernia was caused by the accumulation of urine in her abdomen and the previous surgeries. Alleging negligence by Drs. Singletary and Norwood, the Poseys sought to recover their resulting damages. In an amended petition filed October 6, 1998, the plaintiffs added WK as a defendant. On October 28, 1998 WK filed, along with its answers, an exception of prescription in the action. That exception is still pending before the trial court.
On July 14, 1999, the plaintiffs filed a petition for authority to settle the matter with Dr. Singletary and his insurer for $100,000 but to reserve their right to proceed against the Louisiana Patient's Compensation Fund (LPCF) for excess damages. The settlement sought to retain Dr. Singletary as a nominal defendant while dismissing Dr. Norwood and WK. The LPCF was ordered to respond with any objections to the payment and the settlement. The LPCF responded and sought a jury trial. On August 25, 1999, the trial court signed an order approving the settlement, *1253 substituting parties and setting a trial. The Poseys were granted authority to settle and Dr. Singletary was retained as a nominal defendant until the matter was resolved or until the LPCF was substituted as a defendant. In a separate order signed the same day, the trial court dismissed with prejudice the plaintiffs' action against Dr. Norwood while reserving all plaintiffs' claims against all other defendants.
Following the trial, the jury awarded Mrs. Posey $50,000 for past pain and suffering and $60,000 for past medical expenses, $5360 for past lost wages, and $800 for past loss of household services for a total award of $116,160.00. The jury did not award any damages for future pain and suffering, future medical expenses, future lost wages or future loss of household services. Mr. Posey's loss of consortium award was $500.
In the July 10, 2000 judgment signed by the trial court, Mrs. Posey was awarded $16,160, since LPCF was credited for the $100,000 previously paid by Dr. Singletary. Mr. Posey was awarded $500. The plaintiffs filed post-judgment motions for new trial, judgment notwithstanding the verdict and additur. On August 15, 2000, the trial court denied the plaintiffs' post-trial motions. On September 29 the plaintiffs filed a motion for appeal and noted therein that plaintiffs had reserved their rights to proceed against WK which had never been dismissed from the litigation. The order granting the appeal stated that the plaintiffs' claims and proceedings against WK were reserved to the plaintiffs.[2]

TESTIMONY
The attorneys for plaintiffs and LPCF stipulated at the beginning of the trial that the $100,000 paid to the Poseys by Dr. Singletary would not be mentioned to the jury and that the LPCF would be credited with that amount against any damages awarded. They also agreed that legally, there was an admission of harm done as a result of malpractice.
Mrs. Posey testified that a month prior to her 1989 hysterectomy she had been hospitalized at Schumpert for depression. Stating that she was in a lot of pain prior to the hysterectomy, plaintiff testified that Dr. Singletary recommended the 1989 surgery from which she recovered in about four weeks. Concerning her discomfort between the 1989 surgery and the 1993 surgery in which the malpractice occurred, Mrs. Posey described the pain as intermittent but worsening in the months before the surgery so that she cried due to severe pain. Dr. Singletary also prescribed her medication for anxiety during that time. The doctor recommended removing her ovaries which was done November 22, 1993 (when the malpractice occurred). On waking Mrs. Posey stated she was in terrible pain and very nauseated and was "in and out" for a couple of days. She also stated she was very swollen and disoriented. She asked to go home for Thanksgiving where she said her condition and swelling worsened. Mrs. Posey said she was so ill she could not care for herself. Days later she was taken by ambulance back to WK.
After Dr. Norwood performed surgery for the bowel obstruction on November 30, she noted that the swelling decreased, but that it came right back. She continued to be extremely ill and described terrible nightmares and paranoid feelings which she attributed to the anesthesia. She stated her husband did the housework along with family and friends who helped by bed-bathing her, shaving her legs and washing her hair. The pain at this time was more concentrated to the left side of *1254 her body and was more intense. She stated she had to force herself to walk and that her children were frightened by her condition. She was in distress during the holidays and only made brief visits to relatives. She saw Dr. Norwood numerous times during December 1993 with her complaints.
In January 1994 he referred her to a WK urologist who referred her to Dr. Berry at Schumpert. She described her shock when learning her left kidney was in danger. The plaintiff also recounted the difficulties of the nephrostomy, which she stated was like being stabbed in the back, and having to return to have the tube cleared of blockages. She described her discomfort level following Dr. Berry's surgery and the surgery to remove the hematoma. Mrs. Posey stated that Dr. Berry's removal of the stent in March was like someone "slicing a razor blade all the way inside, where you urinate."
Mrs. Posey testified she returned to work in 1994 but her pain started increasing in her abdomen, legs and back. She saw Dr. Berry and Dr. Cox during that period. She left work during April 1995 and continued with intermittent abdominal pain. Prior to Dr. Waterfallen's surgery in September 1996, she experienced upper and lower abdomen pain along with awful back pain. Also before Dr. Waterfallen's surgery, she accompanied her husband and children to Orlando where he had a business conference. She stated special provisions were made for her during the flight and that she spent most of the trip in bed in the room.
Stating she did well for two or three months after Dr. Waterfallen's surgery, she began to have recurrences of pain in the same areas to the extent that her skin in those areas was painful to touch. Dr. Waterfallen treated her with pain medication and referred her for physical therapy. Thereafter he referred her to Dr. Majors for chronic pain care. She acknowledged she was depressed from 1996 to 1998 due to the multiple surgeries.
On cross-examination, Mrs. Posey testified she first saw Dr. Singletary in 1975 when she was twenty years old. When she was approximately seven years old, she had an appendectomy including removal of inflammation and a growth. Dr. Singletary performed a tubal ligation in 1986. Between 1986 and 1990, Dr. Singletary hospitalized her a couple of times for bladder stretches and dilations. From 1985 until 1989, Dr. Singletary occasionally prescribed low doses of Xanax for anxiety. She stated she had abdominal pelvic pain in 1989 and she saw Dr. Islam, a psychiatrist, in 1989, at a time when she had been crying a lot and Dr. Singletary was out of town. She first testified she was working when she saw Dr. Islam but later stated she was off work from 1988 until 1990. She was hospitalized for approximately a week. Dr. Islam prescribed Xanax for her depression and anxiety.
In 1989 Dr. Singletary performed a hysterectomy in an attempt to relieve some of her abdominal pain. From 1989 until 1993 Dr. Singletary treated her for bladder problems. She again had abdominal pain and in November 1993, Dr. Singletary did surgery to remove Mrs. Posey's ovaries to relieve the pelvic pain which Mrs. Posey stated she could not take any more. After that surgery, Mrs. Posey testified she was discharged the day before Thanksgiving, but returned to the hospital a few days later for what was diagnosed as an intestinal blockage. Dr. Norwood performed surgery to remove the intestinal blockage. Dr. Norwood then referred her to Dr. Berry who performed surgery on her left kidney. The surgery was successful and Dr. Berry informed her the kidney was functioning properly on December 5, 1994.
*1255 Mrs. Posey testified she returned to work part time in April 1994 and within a few weeks resumed working full-time. In March 1995 she was able to participate in a jury trial concerning injuries sustained by Mr. Posey in 1992. She was not on morphine at that time. In May 1995 she left her employment permanently due to health problems. In June 1995 she returned to Dr. Berry with pain in her bladder area and he referred her to Dr. Waterfallen who performed surgery in September 1996. During the 1996 surgery, Dr. Brown performed an abdominoplasty (tummy tuck) and Dr. Sasaki did repairs and released adhesions to the bowel. Dr. German, Dr. Berry's partner, was there to check on her ureter and kidney. A month after that surgery on an October 1996 visit, Dr. Waterfallen noted that most of her adhesion pain was gone. Thereafter, her pain returned and Dr. Waterfallen referred her to Dr. Majors, a chronic pain specialist in May 1998. After the 1996 surgery, Mrs. Posey stated she went to physical therapy ordered by Dr. Waterfallen. The physical therapist's records stated Mrs. Posey was discharged for non-compliance. However, Mrs. Posey testified she quit because her prescription ran out and because the therapy included a machine which she could not handle.
Mrs. Posey's mother, Helen Boggs, testified that her daughter did not have abdominal problems and pain, except for normal menstrual cramps, prior to the November 1993 surgery performed by Dr. Singletary. Since that surgery, Mrs. Posey has been unable to attend family gatherings as she had in the past and has not been able to care for her home. Mrs. Boggs stated that she and other relatives assisted the plaintiffs with house work. On the rare occasions when visiting her mother's home, Mrs. Boggs testified her daughter stayed no more than two hours and spent the time laying in bed. On cross examination, the witness acknowledged her daughter had a partial hysterectomy prior to this and abdominal surgery as a child.
Thomas Campbell, a pharmacist at Eckerds, testified that the total amount paid by the patient and billed to her insurer was $10,813.33 for all drugs including those unrelated to pain relief. The amount Mrs. Posey paid for those same drugs was $1,663.15. Between 10/21/97 and 6/27/99 the pharmacy filled fifty-seven prescriptions for pain medication for Mrs. Posey.
Mrs. Posey's sister, Linda Day, testified that prior to the November 1993 surgery, she and Mrs. Posey had done step aerobics three times a week until Day learned she was pregnant and had to stop. Since the 1993 surgery, Mrs. Posey has been unable to exercise. Day recalled Mrs. Posey had a partial hysterectomy some four years prior to the November 1993 surgery. Her sister had an uneventful recovery from the earlier surgery and was able to return to work in four to six weeks. She did not recall other prior surgeries. According to the witness, Mrs. Posey's husband did the housework that Mrs. Posey was no longer able to do.
Plaintiff's husband, Michael Posey, stated that prior to the November 1993 surgery her abdominal pain was limited to those associated with her menstrual cycle. That discomfort was not disabling although she sometimes used a heating pad. After her 1989 hysterectomy, Posey stated his wife had a normal recovery. He described in detail how ill she was between the November 1993 surgery by Dr. Singletary and the surgical repairs by Dr. Berry. He noted that after a lengthy recovery she returned to work initially part time and then full time. However, she complained of abdominal pain daily. She eventually had to quit work because it was too hard *1256 on her. She had sleeping difficulty and learned in 1996 that she had a cyst which required surgery which was very upsetting to her and her husband.
After treating Mrs. Posey for many years, Dr. Singletary testified he first diagnosed PAD (pelvic adhesive disease) on September 29, 1989. In the 1989 hysterectomy, Dr. Singletary also did lysis (release) of extensive adhesions. In September of 1990 the doctor noted among other problems, extensive pelvic adhesive disease. Extensive PAD was also noted in October 1991 and May 1992 and Mrs. Posey continued taking anti-depressants. In November 1993 Dr. Singletary removed Mrs. Posey's ovaries and tubes and freed adhesions in her abdomen. During surgery, the doctor found very extensive adhesions and noted a small rent in her bladder which he repaired. At the time he closed her abdomen, Dr. Singletary saw no urine present in the surgical field.
Dr. William Norwood testified that he was asked by Dr. Singletary to examine Mrs. Posey for a possible bowel obstruction. He first saw the plaintiff on November 29, 1993 and last saw her January 10, 1994. Dr. Norwood performed surgery November 30 and separated a small bowel obstruction. During the surgery, the doctor observed no other problems in her abdomen. Dr. Norwood removed 3,000 ccs of dark brown, ascrites (abnormal accumulation of fluid in the abdominal cavity) which he opined was not urine from a cut ureter. The fluid was cultured but not tested for the presence of urine. On cross-examination, the doctor explained that had the fluid been urine, there would have been a strong uriniferous odor because the urine concentrates. This fluid had no odor. During subsequent examinations during this hospital stay, Dr. Norwood found fluid waves, or free fluid in the abdomen. Dr. Norwood stated that Mrs. Posey's bowel obstruction was not caused by any malpractice committed by Dr. Singletary when he performed the surgery on November 23. In his opinion, Mrs. Posey never had urine in her abdominal cavity.
Dr. John L. Berry, a genitourinary surgeon, testified that a urologist at WK referred Mrs. Posey to him for treatment of an obstructed left kidney, since the family preferred she not be treated again at WK. After seeing her on January 12, 1994, Dr. Berry performed tests on plaintiff in the hospital on January 13 and confirmed that the kidney was blocked. He attempted unsuccessfully to clear the blockage by passing a plastic tube through her bladder. In the X-ray department and using a local anesthetic, Dr. Berry then performed a nephrostomy, a procedure in which a drain tube is punctured directly into the kidney to permit the kidney to drain freely and save it. He informed the family at that time he was optimistic the kidney would heal properly. The doctor discharged Mrs. Posey with the drain tube directly in her back with a bag to collect urine on her leg which she retained for about a month.
The doctor waited a month to permit the kidney swelling and reaction to subside. During that period she had to return to get assistance in unstopping clogs in the tube. On February 17, 1994, Dr. Berry did exploratory surgery in the area where the ureter was blocked. After freeing the scarring, the doctor removed the blocked portion of the ureter. The doctor freed the bladder from the other side to bring it up and reattach the shortened ureter, a procedure called a psoas hitch. He also removed the nephrostomy tube. A urinoma (urine outside the urinary system) was present at the time of the January x-ray but by the February surgery that was gone, having been reabsorbed by the body. Dr. Berry explained when urine flows outside the urinary system, the body encapsulates the free urine and forms a urinoma. *1257 Dr. Berry stated the urinoma was visible in the January 1994 x-rays but had been reabsorbed by the body when he did the February surgery.
His opinion was that the ureter was cut in the November 1993 surgery. Dr. Berry discharged Mrs. Posey after ten days in the hospital with a J-tube, a stent between the kidney and the bladder to give the ureter repairs time to heal. The J-tube was removed in Dr. Berry's office without anesthetic on March 16. The doctor next saw Mrs. Posey April 15 for a post-operative visit at which she was doing well. X-rays on April 21 revealed the kidney was working properly and not swollen. Dr. Berry saw her on June 29 and treated her for a bladder infection. The next visit was November 18 at which Dr. Berry ordered x-rays on November 28 which showed her kidney working well. On December 5, Dr. Berry did a bladder x-ray which showed that ureter was not blocked and that urine properly passed from the bladder back into the kidney. Dr. Berry testified this reflux (urine going back and forth between the bladder to kidney) is normal and harmless in adults who have the procedure he performed on Mrs. Posey. Reflux causes no side effects. He called Mrs. Posey at that time and informed her she had a functioning left kidney.
Mrs. Posey went to Dr. Berry on June 14, 1995 when she complained of abdominal pain. Dr. Berry stated that at the 1995 visit, his follow up of his urologic treatment of the damaged ureter was "pretty much over with." His CAT scan revealed what he thought was a cystic structure and he referred her to Dr. Waterfallen, a gynecologist. Ultimately, the "cyst" proved to be a pseudocyst, adhesions collecting fluid.
Concerning the 3000 ccs of fluid found in Mrs. Posey's abdomen during Dr. Norwood's surgery, Dr. Berry testified his statement in his correspondence to Dr. Waterfallen that the fluid was urine was a guess. He acknowledged it could have been fluid from surgery. When informed that Dr. Norwood had opined that the fluid was not urine, Dr. Berry stated he would defer to him.
On cross-examination, Dr. Berry stated that he charged the plaintiffs only what their insurance paid and they paid nothing out of their pockets for his services. During the February 1994 repair surgery, Dr. Berry could not tell that the ureter had been cut, only that it was blocked. Dr. Berry testified that he saw no evidence that Mrs. Posey had been burned internally by urine. In correspondence to the Poseys' attorney, Dr. Berry stated he thought that the pelvic mass noted in June 1995 was a spontaneous occurrence with no relation to her November 1993 surgery and subsequent repairs. He testified he would defer to Dr. Waterfallen on causation. While hospitalized for Dr. Berry's surgical repairs, Mrs. Posey had a small hematoma near her rectum removed by Dr. Grimes.
Dr. Allen Cox, a family practitioner, testified he saw Mrs. Posey in June 1994 for hot flashes and mood swings for which he prescribed a female hormone. In August she was still having problems so he changed her hormone treatment and prescribed an anti-depressant.
Dr. John Waterfallen testified that Dr. Berry referred Mrs. Posey to him in June 1995 for evaluation of a possible ovarian mass in her abdomen. The history supplied by Dr. Berry stated urine had been found in her abdomen. Dr. Waterfallen initially followed the mass conservatively, but later chose to operate since the mass increased in size as did her pain. During surgery on September 24, 1996, the doctor found the mass to be a false cyst which he explained was the accumulation of clear peritoneal fluid between structures. Dr. *1258 Waterfallen found a very large number of adhesions. He opined that the adhesions resulted from the urine in the abdomen as a result of the 1993 injury to the ureter in Dr. Singletary's surgery.
Dr. Waterfallen stated that the plaintiff was disabled due to chronic abdominal pain. His opinion was that her pain was caused by the adhesive process, since the urine problem had previously been fixed. For two months after his 1996 surgery she was much improved. At that point he recommended she return for yearly visits and that she receive physical therapy. Thereafter she had mild pain and by six months from the surgery, Mrs. Posey had moderate pain which he characterized as a typical course for adhesive pain. Dr. Waterfallen acknowledged that adhesions can be caused by surgery itself.
The doctor received a report that Mrs. Posey was discharged from physical therapy for non-compliance. He also referred her to a chronic pain specialist. Stating he did not see her abuse her medication, Dr. Waterfallen admitted his concern about abuse of medication was the main reason he referred Mrs. Posey to a chronic pain management doctor who was in a better position to treat complaints of chronic pain.
Dr. Larry Sasaki testified Dr. Waterfallen called him in to assist while Mrs. Posey's surgery was in progress. He freed portions of the colon from adhesions. He noted that adhesions can have many causes, among them surgery itself, blood, or urine. Therefore, he did not have any opinion as to whether the presence of urine caused Mrs. Posey's condition.
Dr. Gary Booker, a psychiatrist, testified that Mrs. Posey's pain management physician referred her to him for complications from chronic pain. At the time she was being treated with different forms of morphine. Over the course of her treatment, he prescribed three different types of antidepressants plus sleeping pills over ten visits and on one occasion, a decongestant. The doctor opined that she had chronic major depression the symptoms of which waxed and waned over time. Dr. Booker considered her 100% sincere and had no documentation of her abusing the medication. The doctor stated he had treated her for two years with no improvement. He opined she would need weekly, expensive psychotherapy sessions to improve.
Dr. Kathleen Majors, an anesthesiologist with a subspecialty in pain management, testified she began treating Mrs. Posey in 1998 on a referral from Dr. Waterfallen for chronic abdominal pain. As part of the agreement for treatment, the patient must sign an agreement not to get pain medication from any other doctor. The goal of chronic pain care is 50% pain relief and the patient to be more active. Dr. Majors has seen so sign of drug abuse.
Initial treatment was medication, pain counseling, testing, nerve blocks (eventually cancelled as ineffective) a TENS unit and a recommendation for weight loss. The doctor tried a variety of medications and eventually had to use MS Contin, a long acting morphine. When she got decreased results from MS Contin, they tried Duragesic patches which were unsuccessful. Since the testing indicated major depression and depression amplifies pain, she referred her for psychological care to Dr. Booker.
The testing showed Mrs. Posey had a lot of emotional problems and psychosomatic involvement which meant that her mental anguish might magnify her physical symptoms. Test results showed she overplayed physical and downplayed psychological symptoms. Dr. Majors explained some patients do not like to admit psychological problems; that indicated a possible problem with counseling if the patient was not open to it. Dr. Majors opinion was that *1259 the "fake bad scale score" meant that Mrs. Posey was not portraying herself accurately. The testing suggested extra care was needed if chronically using narcotics for pain relief. The test also showed a "grossly elevated hypochondriasis." Dr. Majors explained it was difficult to treat patients with these type results because so much "emotional stuff" is going on. Patients with test results like Mrs. Posey were said to "attempt to avoid responsibility and/or being manipulative to the expression of physical symptoms." Dr. Majors said that was consistent with a patient who had the family wait upon the patient. That practice is contrary to pain management care because it tends to perpetuate the cycle of pain.
Mrs. Posey was also stated to have a histrionic personality disorder which means that the person tends to be dramatic. The test results indicated that she would be difficult to treat. Dr. Majors stated during her course of treatment, Mrs. Posey sometimes reported good relief from pain and that she did well on a 1998 trip to Las Vegas with her husband. During her early treatment by Dr. Majors, Mrs. Posey also traveled to New Orleans with her husband.

DISCUSSION

Jury Instructions
The plaintiffs argue on appeal that the trial court erred in failing to give the jury proper instructions on causation and certain evidentiary issues. Further, that failure left the jury without adequate foundation to decide causation or damages. Since the jury verdict is tainted in the plaintiffs' view, the Poseys urge that this court should render a judgment on the record. In Nicholas v. Allstate Ins. Co., 99-2522 (La.8/31/2000), 765 So.2d 1017, 1023, the supreme court stated:
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if they adequately provide the correct principles of law as applied to the issues framed in the pleadings and evidence and whether they adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. (Citations omitted.)
Generally, the factual findings of the jury are given great weight and may not be disturbed by the appellate court absent manifest error. See Rosell v. ESCO, 549 So.2d 840 (La.1989). When a jury verdict is based upon instructions that are faulty in a critical way, the verdict is tainted and is not entitled to a presumption of regularity. To make this determination, the court must compare the degree of error with the entire instructions and the circumstances of the case. Wilson v. National Union Fire Ins. Co. of La., 27,702 (La.App. 2d Cir.12/6/95), 665 So.2d 1252.
Plaintiffs state that the trial court did not instruct the jury properly on causation because plaintiffs only had to prove damages, not causation. Alternatively, they argued that the trial court failed to *1260 adequately instruct the jury on the issue of causation. The plaintiffs sought to have the trial court give the jury multiple special instructions including ones on causation; aggravation of pre-existing condition; pre-existing injuries; pre-existing condition and causation; and subsequent maltreatment. Plaintiffs also objected that the trial court did not mention the LPCF in the instructions.
The Preliminary Jury Charge included the following:
In a civil case, such as this, the plaintiffs must prove each essential element of the case by a preponderance of the evidence. That simply means that taking the evidence as a whole, the facts have been established as more probable than not. In this particular case, the issue of fault or negligence has been admitted. The only issue you will have to decide is what injury resulted from that fault or negligence, and the amount of damages to be awarded.
The Concluding Civil Jury Charge read to the jury before its deliberations began stated, in part:
In this case, Dr. Singletary has admitted that he breached the standard of care owed to Pamela Posey and that she suffered, harm as a result of the breach. It is now your responsibility to determine the extent of that harm and the amount of damages which will fairly and adequately compensate the plaintiffs for that harm.
The plaintiffs have the burden of proving the extent of the harm and the amount of damages by a preponderance of the evidence. This simply means that taking the evidence as a whole, the facts have been established as more probable than not.
A party should not prevail simply because they have a greater number of witnesses. Any award of damages in this case should be equal to the injury received. The plaintiffs have the duty to act reasonably in mitigating their damages to the extent possible. The defendant is responsible for all of the natural and probable consequences of Dr. Singletary's breach.
The foregoing jury charges clearly set out that Dr. Singletary admitted breaching the standard of care and that harm resulted to the plaintiffs from his breach. Plaintiffs' complaints that causation instructions were inadequate are meritless.
Alternatively, the plaintiffs contended that the trial court should have informed the jury (1) the defendant takes the victim as he finds her, (2) if a plaintiff is healthy before the harm, then the injury relates back and (3) plaintiff is entitled to recover for aggravation of a pre-existing condition. Plaintiffs' alternative theories were that Mrs. Posey was healthy before the 1993 surgery or that she sustained an aggravation of a pre-existing condition. Contradictory evidence was presented about Mrs. Posey's health prior to Dr. Singletary's 1993 surgery in which he admittedly harmed her ureter and caused her damages. The jury heard from Mrs. Posey, Mr. Posey, her mother and her sister that her health was good with her only pain being normal menstrual discomfort. Dr. Singletary testified, and his records reflected, that he diagnosed Mrs. Posey with PAD as early as 1989 when he performed surgery to relieve her pain. He continued to note PAD along with anxiety for which he treated her. In 1989 the record shows that she was hospitalized for depression. In 1993 Dr. Singletary again performed surgery to relieve her abdominal and pelvic pain during which the malpractice occurred.
Dr. Norwood testified that his surgery to correct a blocked intestine was unrelated to Dr. Singletary's malpractice. That admitted malpractice led to Mrs. Posey's *1261 treatment by Dr. Berry whose actions saved her left kidney. Thereafter Dr. Berry referred Mrs. Posey to Dr. Waterfallen for a mass which Dr. Berry opined was unrelated to Mrs. Posey's previous problems with the damaged ureter. In contrast, Dr. Waterfallen opined that the surgery he performed was necessitated by Dr. Singletary's earlier actions.
The plaintiffs argued that the failure of the trial court to give the requested jury instructions meant that the jury would not consider that Dr. Singletary was responsible for the 1996 surgery for adhesions or for aggravation of Mrs. Posey's pre-existing PAD. After hearing the conflicting opinions, the jury obviously concluded that the damages resulting from Dr. Singletary's malpractice were of limited duration and that her subsequent problems with PAD were unrelated to the malpractice.
According to the plaintiffs, the absence of any reference to the LPCF in the instructions meant that the jury concluded that Dr. Singletary would have to pay any judgment. The record belies that assertion. The opening statement by plaintiffs' attorney carefully explained the meaning and role of the LPCF and pronounced that Dr. Singletary was a nominal defendant and the LPCF "comes in to pick up the pieces." During trial plaintiffs' counsel also made certain that the jury knew that the defense counsel was representing both Dr. Singletary, who was described as a nominal defendant, and the Louisiana Patient's Compensation Fund.
Since no one actually saw the ureter being cut or damaged, plaintiffs argued that the trial court should have instructed the jury on circumstantial evidence. However, the injury and harm were admitted. The jury heard extensive medical testimony that Mrs. Posey had urine in her abdomen which caused extensive problems and medical evidence to the contrary. The jury evaluated and believed the testimony of the doctors who opined Mrs. Posey was not damaged internally by urine.
After presentation of all the evidence and arguments at trial, the court must instruct the jurors on the law applicable to the cause submitted to them. La. C.C.P. art. 1792. Adequate jury instructions provide the correct principles of law for the jury to apply to those issues reasonably raised by the pleadings and evidence. The trial court is not required to give the precise instruction submitted by a litigant, but need only give instructions which properly reflect the applicable law. Worsham v. Hetrick, 34,206 (La.2/7/2001), 777 So.2d 1280.
In this matter the trial court and the jury were aware of and heard testimony about the myriad issues concerning the extent, duration and nature of Mrs. Posey's harm by Dr. Singletary. The trial court clearly instructed the jury that plaintiffs were entitled to recover for all natural and probable consequences of Dr. Singletary's malpractice. This court would have preferred more detailed instructions to the jury in this complex case. However, the trial court has great discretion in composing jury instructions and is not required to give the exact instructions submitted by a litigant. We cannot say that the instructions misled the jury or prevented justice being done. Though brief, the instructions informed the jury correctly of the law and of their responsibilities to determine the damages resulting from the admitted malpractice and to make appropriate awards for those damages. After examining this record, we find that the instructions correctly stated the law and provided adequate guidance to the jury.

Plaintiffs' Post-Trial Motions for JNOV, New Trial and Additur
While La. C.C.P. art. 1811 governs the use of Judgment Notwithstanding the *1262 Verdict, the article does not set out the grounds on which the trial court may grant a JNOV. In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La. 1991), the Louisiana Supreme Court set out the criteria. A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the party seeking the JNOV that reasonable men could not reach different conclusions. The JNOV should not be granted merely when there is a preponderance of evidence for the mover. If the opposing evidence is of such quality and weight that reasonable men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. In reviewing a JNOV, the appellate court must determine if the trial court erred in granting the JNOV by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Craighead v. Preferred Risk Mut. Ins. Co., 33,731 (La.App. 2d Cir.8/25/2000), 769 So.2d 112, writ denied, 2000-2946 (La.12/15/00), 777 So.2d 1230.
The trial court properly denied the plaintiffs' motion for Judgment Notwithstanding the Verdict. The jury heard medical evidence supporting both the plaintiffs' and the defendants' versions of what caused Mrs. Posey's problems. The plaintiffs asserted that all of Mrs. Posey's multiple medical treatments up until the time of trial directly resulted from Dr. Singletary's admitted negligence and, specifically, from the presence of urine which burned her insides and led to the pseudo-cyst upon which Dr. Waterfallen operated. The defendants submitted that Mrs. Posey had recovered from the ill effects of Dr. Singletary's malpractice by March or April of 1994 following Dr. Berry's February 1994 surgical repair of the damaged ureter. The jury obviously accepted the defense evidence that Mrs. Posey recovered within months of Dr. Berry's surgery.
Dr. Singletary testified he had treated Mrs. Posey for many years and diagnosed PAD in 1989. During the 1989 surgery he found and released extensive adhesions. Dr. Singletary continued treating Mrs. Posey for anxiety and for pain attributed to PAD. In the 1993 surgery in which the malpractice occurred, the doctor stated he again encountered severe adhesions which he corrected. Both Dr. Norwood, who removed the bowel obstruction, and Dr. Berry, who repaired the damaged ureter, found adhesions. Dr. Norwood explained to the jury why he concluded the fluid he removed from Mrs. Posey's abdomen was not urine. Dr. Berry found her kidney functioning well in April 1994. When she reported abdominal pain in June 1995, Dr. Berry referred her to Dr. Waterfallen for treatment of the mass in her abdomen. Dr. Berry stated the mass was unrelated to the earlier malpractice, but did state in a letter to Dr. Waterfallen that urine had been free in Mrs. Posey's abdomen. Dr. Berry acknowledged this reference to *1263 urine was an assumption on his part and he would defer to Dr. Norwood for a positive identification of the fluid. Dr. Berry also stated he would defer to Dr. Waterfallen who opined that the pseudocyst and adhesions encountered in his 1996 surgery resulted from Dr. Singletary's malpractice.
After hearing the testimony that Mrs. Posey's post 1994 surgery and other medical treatments did and did not result directly from the 1993 malpractice, a reasonable jury could have concluded that, while damaged by Dr. Singletary, the harm was resolved some months after Dr. Berry's surgical repairs. Based on the evidence in the record, a reasonable jury also could have concluded that although Mrs. Posey continued to be plagued with PAD following her recovery from the malpractice, the malpractice had no impact upon her PAD and subsequent problems with chronic pain.
This litigation is a prime example in which opposing evidence is of such quality and weight that reasonable men in the exercise of impartial judgment could reach differing conclusions. All reasonable inferences or factual questions were properly resolved in favor of the defendants, the non-moving parties. While another reasonable trier of fact may have reached a different result, we cannot say the evidence points so strongly in favor of the plaintiffs that reasonable men could not conclude her damages from the admitted malpractice had resolved some months after Dr. Berry's February 1994 repairs.
A new trial must be granted, upon contradictory motion of any party, when the verdict or judgment appears clearly contrary to the law and the evidence. La. C.C.P. art. 1972. A new trial may be granted in any case if there is good ground. La. C.C.P. 1973. Louisiana jurisprudence is clear that a new trial should be ordered when the trial court, exercising its discretion, is convinced by its examination of the facts that the judgment would result in a miscarriage of justice. The granting or denying of a motion for new trial rests within the wide discretion of the trial court, and its determination should not be disturbed absent a clear abuse of discretion. Raburn v. Williams, 34,718 (La.App. 2d Cir.5/9/2001), 786 So.2d 955.
In Martin v. Heritage Manor South Nursing Home, XXXX-XXXX (La.4/03/2001), 784 So.2d 627, the supreme court explained that deciding whether to grant a new trial requires a discretionary balancing of many factors. Although the granting or denying of a motion for new trial is within the wide discretion of the trial court, the discretion of the court is not unlimited. The trial court cannot freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution because a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. The jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.
In considering a motion for new trial under La. C.C.P. art.1972, the trial court may (1) evaluate the evidence without favoring either party; (2) draw its own inferences and conclusions; and (3) evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. However, this does not mean that the trial judge can usurp the jury's fact-finding role. A motion for a new trial requires a less stringent test than for a JNOV.
*1264 In balancing the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial, the scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case. Martin v. Heritage, supra.
Our extensive review of this record included an evaluation of the evidence without favoring either party, drawing our own inferences and conclusions, and making an evaluation of witness credibility. We cannot say that the jury gave too much credence to an unreliable witness. Since this verdict is supported by a fair interpretation of the evidence, the trial court did not err in denying the motion for a new trial. This conclusion pretermits a discussion of the plaintiffs' motion for additur. See La. C.C.P. art. 1814.

Quantum
In brief, the defense acknowledges that the Poseys are entitled to recover for all damages that resulted from Dr. Singletary's admitted negligence in damaging Mrs. Posey's left ureter during the November 1993 surgery. The jury clearly rejected awarding any future damages and concluded that Mrs. Posey's ill effects from the malpractice were of limited duration by awarding to the plaintiffs $60,000 in past medical expenses. Our review of the record requires an adjustment to this award. Dr. Berry testified that at the March and April visits after his February 1994 surgical repairs to Mrs. Posey's damaged ureter, the patient was doing well. However, the record also contains evidence of his evaluation of her recovery from surgery in November and December 1994. For that reason, we conclude that plaintiffs are entitled to recover for the medical expenses admitted into evidence through December 1994 when Dr. Berry informed his patient by telephone that her kidney was functioning properly, or $66,558.93. Therefore, we amend the jury's award of $60,000.00 for past medical expenses and award an additional $6,558.93 for a total award for past medical expenses of $66,558.93.
Seeking $500,000, the plaintiffs argued that the jury erred in awarding Mrs. Posey $50,000 for pain and suffering. In Beasley v. Yokem Toyota, 33,805 (La.App. 2d Cir.8/23/2000), 767 So.2d 149, this court discussed general damages. La. C.C. art. 2324.1 provides that in assessing damages, much discretion must be left to the jury. To modify an award for general damages, an appellate court must find that the jury has abused the "much discretion" accorded by the statute. Each case must be weighed and evaluated according to its own particular facts and circumstances. General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of life or lifestyle that cannot be measured definitively in terms of money. The primary objective is to restore the injured party as nearly as possible to the state she was in at the time immediately preceding the injury. The factors to be considered in assessing quantum for pain and suffering are severity and duration and each case must rest on its own set of facts. The discretion vested in the trier of fact is "great" and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons may disagree about the appropriate amount of general damages in a particular case. Only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of a particular injury to that specific plaintiff should the appellate court increase or reduce the award. Beasley v. Yokem, supra.
*1265 While we find that the jury reasonably concluded that Mrs. Posey's damages were of a limited duration, she endured a terrible ordeal before the ureter problems was discovered, addressed and corrected. She underwent numerous medical procedures for the diagnosis and correction of Dr. Singletary's admitted malpractice for which the medical expenses totaled over $66,558.93. Clearly she suffered significant discomfort and pain from the initial surgery until she recovered completely from Dr. Berry's repairs.
In a somewhat similar matter, Kippers v. Corcoran, 97-870 (La.App. 5th Cir.1/27/98), 707 So.2d 463, the plaintiff's right hepatic duct was lacerated during surgery to remove her gall bladder. The patient's complaints of severe pain, burning, nausea and sleeplessness were treated as normal post-operative conditions. She was discharged two days later and continued to be very ill with severe gas and vomiting which the doctor treated with suppositories. She returned to the hospital about a week later and was admitted. The severed bile duct was discovered and she underwent three surgical procedures and other treatments to correct the problems caused by the bile leakage. The court awarded her $28,217.88 in special damages and $35,000 in general damages.
While recognizing the jury's great discretion in this matter, we conclude that the $50,000 past pain and suffering award was unreasonably low under the circumstances of this case. We amend that award to increase the award for past pain and suffering by awarding Mrs. Posey an additional $50,000 for a total of $100,000 which we consider to be the lowest reasonable amount for past pain and suffering under the facts in this case.
In general, a claim for loss of consortium has seven elements: (1) loss of love and affection, (2) loss of society and companionship, (3) impairment of sexual relations, (4) loss of performance of material services, (5) loss of financial support, (6) loss of aid and assistance, and (7) loss of fidelity. A loss of consortium award is a fact-specific determination, to be decided case-by-case, and is disturbed only if there is a clear showing of an abuse of discretion. O'Neal v. Scott, 34,276 (La.App. 2d Cir.12/20/2000), 775 So.2d 1155. As to the $500 loss of consortium award to Mr. Posey, it is apparent that the jury considered his testimony about his losses occasioned by this malpractice to have been inaccurate. The jury may have been unfavorably impressed by Mr. Posey's recovery for a 1992 injury in spring 1994 litigation in which Mrs. Posey was awarded loss of consortium. Mr. Posey's testimony contradicted his wife's testimony about her prior pain history.
Dr. Singletary's malpractice occurred in November 1993 and Dr. Berry's surgical repairs were made in February 1994. At any rate, Mr. Posey did undergo significant adversity during the period prior to the diagnosis and correction of the malpractice and her recovery therefrom. We find that the $500 award was abusively low and increase the loss of consortium award to Mr. Posey to $1,500. In all other respects, the quantum awards are affirmed.[3]

Mistrial
Plaintiffs contended that the trial court erred in denying plaintiffs' motion for a mistrial after objecting to testimony by Dr. Singletary in which he likened separating adhesions to trying to separate the cold cheese from cold macaroni without *1266 harming either. Dr. Singletary also explained that as a gynecologist he always kept an eye on the ureter during surgery and that he did not know any "notable surgeon who did complicated pelvic surgery who has not gotten a ureter." He then named two such doctors. In plaintiffs' view, these comments tended to ameliorate or justify the malpractice and entitled them to a mistrial.
The court on its own motion, or on the motion of any party, after hearing, may grant a mistrial. La. C.C.P. art. 1631(C). A mistrial may be declared because of a circumstance that indicates to the court that justice may not be done if the trial is allowed to continue. The trial court is vested with discretion on the decision to grant or deny a motion for mistrial. Griggs v. Riverland Medical Center, 98-256 (La.App. 3d Cir.10/14/98), 722 So.2d 15 writ denied, 99-0385 (La.5/28/99), 735 So.2d 622. The trial court did not err in refusing plaintiffs' motion for mistrial.
During questioning by plaintiffs' counsel, Dr. Waterfallen gave substantially similar testimony. The witness explained that, in removing an ovary, there was a risk of cutting a ureter and that gynecologists think about that "all the time." Dr. Waterfallen stated that in a whole career, no matter how good the surgeon was, it was not unusual to hit a ureter. Under the circumstance of this case, the trial court's refusal to grant the mistrial was not an abuse of discretion.

Introduction of Deposition
According to the plaintiffs, the trial court conditioned the reading of Dr. Hallbridge's deposition to the jury on the defendant's being permitted to call to the witness stand members of the medical review panel. The plaintiffs admit in brief that this conditional decision by the trial court was made off the record. The transcript shows that the plaintiffs' counsel informed the court that he was going to read the deposition of Dr. Hallbridge to the jury. After determining the length of the deposition, the trial court explained to the jury about the use of depositions for witnesses who were unavailable. Then the trial court directed the jury take a break and recessed court. When the trial resumed, the plaintiffs' attorney called another witness and continued with the proceeding without further reference to the deposition.
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. La. C.C.P. art. 2164. This court will not consider matters outside the appellate record. The defendants correctly note in brief that there is nothing in the record that shows plaintiffs attempted to offer the deposition. There is not a ruling by the trial court denying its admission or an objection by the plaintiffs. The assignment of error has no basis in the record.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to increase the award for Mrs. Posey's past pain and suffering by $50,000 to a total award of $100,000, for Mr. Posey's award for loss of consortium by $1000 to a total award of $1500 and for plaintiffs' award for past medical expenses by $6,558.93 to a total award of $66,558.93. In all other respects, the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] A copy of the medical review panel's June 19, 1997 report is attached to Dr. Singletary's answer filed in the record and states that the evidence did not show that Willis-Knighton Medical Center, Dr. Norwood or Dr. Singletary failed to meet the applicable standard of care. Further, the conduct complained of was not a factor in the alleged damages.
[2] This court is treating the language in the appeal order reserving plaintiffs' rights to proceed against WK as sufficient certification by the trial judge of this partial judgment.
[3] We recognize that the plaintiffs admit that Mrs. Posey did not suffer any lost wages until 1995 and that the jury erroneously made an award of $5360 for lost wages. However, the defendants neither appealed nor answered the appeal so that award will not be deleted from the total award owed the plaintiffs.